Anita (Handy) OBERLANDER,
Appellant–Petitioner,

v.

Kevin HANDY, Appellee–Respondent.

No. 08A04–0903–CV–121.

Court of Appeals of Indiana.

Sept. 24, 2009.

Katherine J. Noel, Noel Law, Kokomo, IN, Attorney for Appellant.

Lisa V. Schrader, Lafayette, IN, Attorney for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-petitioner Anita (Handy) Oberlander appeals the trial court's order denying her request for relief from judgment, arguing that the trial court erred by refusing to modify its decision to award custody of Anita's child with appellee-petitioner Kevin Handy to Kevin. Finding that Anita is not entitled to relief pursuant to Trial Rules 59 or 60, but that the trial court should consider whether a modification of custody is warranted, we affirm and remand for further proceedings.

## FACTS

Anita and Kevin began dating in March 2005, and Anita gave birth to the parties' daughter, A.H., on March 14, 2006. Anita also had three children from a prior marriage: De.O., born in March 1991, Dy.O., born in August 1994, and E.O., born in March 1996. Anita and Kevin were married in December 2006, and Anita filed a petition to dissolve the marriage and a petition seeking a protective order on March 22, 2007.

The parties' relationship was tumultuous and frequently violent. Between March 2005 and February 2008, Anita called the police and requested assistance on multiple occasions, alleging that Kevin had physically assaulted her and/or the children.

On March 22, 2007, a protective order was entered that prohibited Kevin from contacting or approaching Anita or the children. During the ensuing week, Kevin allegedly drove by and sometimes parked near Anita's home on numerous occasions and peered into her windows in the middle of the night. Additionally, Anita discovered a sound transmitter under her bed, which Kevin admitted placing there but stated he had done so before the entry of the protective order.

On April 1, 2007, Anita and the children discovered Kevin hiding in their home; Anita deployed a stun gun, but Kevin disarmed her and used the stun gun on her. Kevin fled before the police arrived. The next day, Kevin led police officers on a high speed chase that resulted in a crash and required Kevin to be air-lifted to a hospital.

He was charged with residential entry, battery, domestic battery, interference with the reporting of a crime, and invasion of privacy, and eventually pleaded guilty to class D felony domestic battery. Kevin was sentenced to three years, with two and one-half years suspended to probation and six months on home detention.[1] In a separate proceeding in Cass County, Kevin was charged and convicted of class D felony resisting law enforcement. He was sentenced to eighteen months, with ten days served in jail and the rest suspended to probation.

After Kevin was discharged from the hospital, he allegedly continued to drive past Anita's residence and telephoned Anita repeatedly. Kevin began taking anger management classes and Kevin and Anita resumed couples' counseling with Reverend Thomas McShannock. On June 7, 2007, Reverend McShannock wrote a letter to the trial court requesting that the protective order be modified: ·

> Both Kevin and Anita ... have been under my care since March 12, 2007, for the purpose of improving their marital

---

1. At the time of the final hearing on the dissolution petition, Kevin was still on home detention for battering Anita.

relationship. Unfortunately, therapy quickly reached an impasse due to Kevin's controlling and abusive behavior.

[Kevin] was given a thorough psychiatric evaluation after being hospitalized following his suicide attempt. At that time, he was placed on medication that helped [Kevin] to control his temper and his compulsive and controlling behavior.

\* \* \*

I have come to the conclusion that Kevin is now fully engaged in the therapeutic process in order to change his behavior. It is my professional opinion that [Kevin] should be given a chance to rebuild his relationship with [Anita] and her children . . .

In addition, [Anita] has asked me [to] help her set a plan that could allow Kevin to practice his new behaviors while at the same time giving her and her children some protection against the possible return of Kevin's old abusive behavior.

\* \* \*

. . . [Anita] wishes to continue with keeping Kevin from coming in the house. Kevin should be allowed to telephone Anita during a mutually agreed upon calling schedule. . . .

\* \* \*

I would also recommend that Kevin be given 3–4 hours [per] week to meet in a public area with his family for a family visitation. . . .

Pet. Ex. B. On July 24, 2007, the parties agreed that Kevin could have restricted visitation if he continued counseling and taking his medication, and the protective order was modified accordingly.

In August 2007, Kevin's parenting time with his daughter from another marriage was halted because of his behavior. In September 2007, Kevin returned to the marital home against Anita's wishes but the police informed Anita that the modified protective order was ambiguous as to whether Kevin was permitted to be in the residence; thus, they refused to order him to leave. Kevin began living there and refused to leave.

On February 20, 2008, Anita received a telephone call regarding her youngest son, who was home with Kevin. She called Kevin, who demanded to know why her cell phone—which he had allegedly broken earlier in the week—had been turned off all day. Anita returned home, finding De.O. standing outside, locked out. Evidently, De.O. had done something to the computer keyboard, and Kevin told Anita that De.O. was "a fucking cock sucker and a bitch boy." Tr. p. 31. Kevin demanded to know where Anita had been all day long, accusing her of "being out fucking around," *id.* at 32, eventually throwing his wedding ring at Anita's face. Kevin allegedly destroyed a Nintendo game system and later apologized to Anita for throwing A.H. out of the computer chair, causing the child's head to hit the coffee table. Anita called the police, who arrived and investigated the situation. Kevin did not want to permit Anita to leave the home, but police officers remained so that she could gather her belongings and leave with the children. Approximately one week later, Anita and the children moved to South Carolina, where her father lives, because "there was absolutely no way that I could be anywhere within the state or within any county next to [Kevin] because he would hunt me down and find me. As he had in the past." *Id.* at 43.

During March and April 2008, Kevin incessantly telephoned and emailed Anita while she was in South Carolina, filling up her voicemail box with messages. He

stopped contacting her after he was sentenced on May 15, 2008, on the domestic battery charge, because a condition of probation was that he cease contact with Anita.

On April 1, 2008, the trial court set the final hearing for July 22, 2008. Anita's attorney had withdrawn and she attempted to find an attorney through legal aid, but was evidently unsuccessful. Anita was unable to attend the final hearing because she did not have the financial resources to travel to Indiana; she also later testified that she feared for her safety and A.H.'s safety if they returned to Indiana. The trial court proceeded with the hearing in her absence and ruled in Kevin's favor, awarding him full custody of A.H. and all marital property except for the vehicle being driven by Anita. Among other things, the court found that Anita

> abandoned [Kevin] and removed [A.H.] from the State of Indiana on or about February 20, 2008 and has hindered any type of visitation between [Kevin] and [A.H.] The Court finds that the actions by [Anita] are detrimental to the relationship of [Kevin] and [A.H.] ... The Court finds that [Anita's] conduct on or about February 20, 2008 is unconscionable.

Appellant's App. p. 12.

On August 21, 2008, Anita filed a request for relief from judgment because of fraud, alleging, among other things, that Kevin had committed perjury when he had testified at the final hearing that he did not know that Anita planned to move to South Carolina, that he did not know why she had not permitted him to have contact with A.H., and that he did not have a phone number for Anita after she moved out in February 2008. The trial court held a hearing on Anita's motion on November 26 and December 19, 2008, hearing testimony from multiple witnesses but prohibit-

ing Anita from presenting evidence regarding events that were remote in time from the July 22, 2008, hearing.

The trial court requested that the Department of Child Services (DCS) investigate the situation and prepare a report with a recommendation as to the best interests of A.H. DCS's recommendation was that Anita have custody of A.H., with Kevin having supervised visitation until he proved that he had completed all domestic violence and anger management counseling from an accredited agency, at which point he should be permitted unsupervised visitation.

On January 2, 2009, the trial court denied Anita's motion, finding that DCS

> suggests that custody should lie with [Anita]. Court cannot reach that level of scrutiny however, as [Anita] failed to establish fraud by [Kevin]. As such, her T.R. Motion must fail.

\* \* \*

> While court is without authority to justify a change of custody, Court on its own, authorizes Joint Custody (father still with the primary care so long as his parents remain available to assist.)

\* \* \*

> IT IS ORDERED that [Kevin's] custody of child pursuant to decree be joint with [Anita], primary remaining with [Kevin], there being no grounds to otherwise alter said order.

Appellant's App. p. 16–17. Anita now appeals.

### DISCUSSION AND DECISION

Anita's motion was called a "Request for Relief From Judgment Because of Fraud" and was explicitly based upon Trial Rule 60(B)(3), which provides that the trial court may relieve a party from a judgment

because of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party[.]"

■ A Trial Rule 60(B) motion for relief from judgment "'affords relief in extraordinary circumstances which are not the result of any fault or negligence on the part of the movant.'" *Dillard v. Dillard,* 889 N.E.2d 28, 34 (Ind.Ct.App.2008) (quoting *Goldsmith v. Jones,* 761 N.E.2d 471, 474 (Ind.Ct.App.2002)). We review the denial of such a motion for an abuse of discretion, which occurs when the denial is clearly against the logic and effect of the facts and inferences supporting the judgment for relief. *Dillard,* 889 N.E.2d at 33. The movant bears the burden of demonstrating that relief is necessary and just. *Id.*

■ Anita argues that the trial court should have treated her motion as a motion to correct error pursuant to Trial Rule 59 rather than a motion for relief from judgment. *See Hubbard v. Hubbard,* 690 N.E.2d 1219, 1221 (Ind.Ct.App.1998) (finding that trial court should have treated Mother's "motion to reconsider" as a motion to correct error). Anita's argument, however, is based upon evidence outside the record, primarily her own version of events. In such a situation, the movant is required to include supporting affidavits showing the truth of the grounds set out in the motion. Ind. Trial Rule 59(H). Anita included only one affidavit and omitted the most important one—her own. Anita did, however, testify at the hearing, along with many other witnesses, so the trial court had sworn testimony to evaluate when ruling upon her motion. Initial procedural defect notwithstanding, therefore, we note

that, as for a motion for relief from judgment, we review the denial of a motion to correct error for an abuse of discretion. *Scales v. Scales,* 891 N.E.2d 1116, 1120 (Ind.Ct.App.2008).

■ We can only conclude, however, that Anita is not entitled to relief via these procedural vehicles whether her motion is treated as one for relief from judgment or one to correct error. The only reason that these matters were outside the record— the only reason the trial court did not have Anita's version of events before it—is because Anita failed to appear at the final hearing. We cast no aspersions upon her stated reasons for her failure to appear, but the simple fact is that she was not there and the trial court was entitled to proceed in her absence. Asking the trial court to revisit its judgment based upon evidence that was not presented the first time around because of one party's failure to appear and introduce the evidence is inequitable. Her failure to appear precludes her from seeking relief from judgment, *Dillard,* 889 N.E.2d at 34, and precludes her from making a valid argument that the trial court actually committed an "error" that must be rectified. Therefore, we are compelled to confirm the trial court's denial.[2]

That said, we do not believe that Anita is altogether without options with respect to custody of A.H. It is evident that the trial court believed that it was compelled by the constraints of Trial Rule 60(B)(3) to consider as a threshold matter whether Anita had established that Kevin had committed fraud, which is an extremely difficult case to make. *See* Appellant's App. p. 16–17 (trial court acknowledging that DCS "suggests that custody should lie with" Anita but finding that the court could not

---

**2.** This analysis also includes Anita's arguments regarding the division of the marital estate; our affirmation of the trial court's order necessarily means that she is not entitled to relief on that issue.

"reach that level of scrutiny" because Anita "failed to establish fraud"). Though we certainly understand the trial court's rationale, we believe it had—and has—another option.

 It is well established that "[a] trial court that grants the initial custody decree has full and continuing jurisdiction during the minority of the children to periodically order and modify custody." *Cox v. Cantrell*, 866 N.E.2d 798, 805 (Ind.Ct. App.2007), *trans. denied.* We also observe that the child's best interest is the paramount consideration in custody decisions and necessarily takes precedence over the parents' interests and desires. *Wallin v. Wallin*, 668 N.E.2d 259, 261 (Ind.Ct.App. 1996). Given these two rules, we believe that the trial court should have treated Anita's motion as a motion to modify the custody arrangement set forth in its initial order.[3]

Had the trial court felt free to weigh DCS's uncontroverted recommendation that Anita be given custody of A.H. and Anita's full version of events—much of which is undisputed and much of which was not even allowed into the hearing— against Kevin's evidence from the uncontested final hearing, it is entirely possible that a different result would have been reached. Therefore, we remand this matter to the trial court so that it can revisit this case and weigh *all* of the evidence to determine whether a modification of the current custody arrangement is warranted. We urge the trial court to look to the factors set forth in Indiana Code section 31–17–2–8 and apply those factors explicitly in its final custody order.

The judgment of the trial court is affirmed and remanded for further proceedings consistent with this opinion.

FRIEDLANDER, J., concurs.

RILEY, J., dissents with opinion.

RILEY, Judge, dissenting with separate opinion.

I respectfully dissent from the majority's decision to affirm the trial court's Order. In its opinion the majority attempts to please everyone: on the one hand, it affirms the trial court's Order, while at the same time the majority directs the trial court to reconsider its custody determination in line with Anita's request. While I agree that the custody determination, as it is ordered by the trial court, has to revisited, I would reverse the trial court's decision on Anita's motion to correct error and remand for a new trial, thereby necessitating custody of A.H. to remain with Anita until a hearing could be held.

The majority commences its opinion by concluding that Anita's motion to correct error pursuant to Trial Rule 59 is defective because it omits Anita's supporting affidavit. However, the majority ignores that Anita's motion to correct error incorporates her affidavit. The motion is based on Anita's version of events and is signed by Anita's counsel and Anita herself, who affirms "under the penalties for perjury, that the foregoing representations are true." (Appellant's App. p. 34). In addition, Anita attaches other reports and an affidavit as supporting evidence for her representations. As I refuse to elevate form over substance, I would consider Anita's motion to correct error to be without "procedural defect." Op. p. 738.

Anita's motion and later testimony at trial speaks about the parties' tumultuous relationship, the domestic violence during

---

**3.** In fact, the trial court implicitly did just that by modifying its initial order of sole custody in Kevin to a joint custody arrangement with Kevin having primary custody, though the court neglected to weigh all of the evidence in reaching its conclusion.

the marriage, and Kevin's anger issues. It is well documented that Kevin was not only abusive towards Anita, but also physically abusive to the children. Over time and despite the existence of protective orders, the violence grew and culminated in Kevin's plea to a Class D felony domestic battery. Eventually, Anita and the children moved to South Carolina because she feared for her and the children's "safety." (Tr. p. 49). When Anita learned that the trial court had set the final hearing on Anita's petition to dissolve the marriage, she attempted to find an attorney through legal aid and the resources to travel back to Indiana. Despite Anita's request for a continuance, the trial court, on July 22, 2008, proceeded with the final hearing on the divorce decree in Anita's absence and awarded Kevin full custody of A.H. After conducting a hearing on Anita's motion to correct error, the trial court amended its Order, granting joint custody with primary physical custody to reside with Kevin.[4]

In the procedurally similar situation of *Walker v. Kelley,* 819 N.E.2d 832, 837 (Ind.Ct.App.2004) (internal citations omitted), we stated that

> More importantly, granting Mother's motion to correct error comports with the trial court's duty to determine whether a modification of existing support and custody arrangements is in the best interests of the children. In making that determination, the courts shall consider all relevant factors, including ... (6) the mental and physical health of all individuals involved and (7) evidence of a pattern of domestic violence by either parent. In this case, we do not

see how the best interests of the children could be ascertained without a hearing that affords both parents the opportunity to present evidence and cross-examine witnesses, particularly where, as here, both parents have actively participated in the ongoing custody dispute from the beginning and when allegations of domestic violence and physical and mental infirmity are involved.

Setting aside the default judgment requires Father to do nothing more than what he was prepared to so on [the previous hearing], that is, participate in a full hearing at which each parent would have the opportunity to show how the children's best interests would be served by making him or her the custodial parent. On the other hand, if the default judgment were allowed to stand, Mother's oversight would result in the loss of her children, an injustice which far outweighs the inconvenience that Father would suffer and society's interest in the finality of litigation. While the judicial system normally cannot allow its processes to be stymied by simple inattention, the principle of judicial economy must yield to considerations of justice.

In line with *Walker* and its policy considerations, I would grant Mother's motion to correct error and remand for a new final hearing.

---

4. I am troubled by the trial judge's judgment in her award of custody. The trial judge in the case at issue also ruled on the custody modification of Kevin's daughter by a prior marriage. Specifically, on August 16, 2007, the trial judge ordered Kevin's parenting time with his daughter by a prior marriage halted because of Kevin's "irate behavior." (Appellant's App. 47). Apparently, the domestic violence, Kevin's physical abuse towards A.H., and his anger issues in this cause do not reach the required level of "irate behavior" to prevent Kevin's custody of A.H.